**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| FLOR MARIA SANCHEZ, | : | Civil No. 1:21-cv-36 |
| | : | |
| **Plaintiff** | : | |
| | : | |
| v. | : | |
| | : | **(Magistrate Judge Carlson)** |
| KILOLO KIJAKAZI, | : | |
| Acting Commissioner of Social Security[1], | : | |
| | : | |
| **Defendant** | : | |

**MEMORANDUM OPINION**

## I.   Introduction

In Flor Sanchez's case we do not write upon a blank slate. Quite the contrary, this is Sanchez's second Social Security appeal. In 2014, Sanchez applied for supplemental security benefits, alleging that she had become disabled in 2010. (Tr. 62). Sanchez's first Social Security application was denied by an Administrative Law Judge (ALJ) in November of 2016 (Tr. 57-75), and the Appeals Council affirmed this decision in December of 2017. (Tr. 81).

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Accordingly, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure and 42 U.S.C. § 405(g) Kilolo Kijakazi is substituted for Andrew Saul as the defendant in this suit.

One year later, in January of 2019, Sanchez filed this, her second Social Security application, alleging that she had been disabled since December of 2008 due to migraines, degenerative disc disease, obesity, and depression. (Tr. 16, 18). However, during the pertinent time period, the evidence revealed that Sanchez exercised, traveled to Puerto Rico, and engaged in a wide array of activities indicative of some ability to work. Moreover, the only medical experts who opined on the severity of Sanchez's impairments in 2019 agreed that she retained the residual functional capacity to perform some work.  Presented with this evidentiary record, the ALJ denied Sanchez's second disability application, concluding that she could perform a range of light work.

In considering this disability determination we are enjoined to apply a deferential standard of review to Social Security appeals, one which simply calls for a determination of whether substantial evidence supported the ALJ's decision. Mindful of the fact that in this context substantial evidence is a term of art which "means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019), we find that substantial evidence supported the ALJ's findings in this case. Therefore, for the reasons set forth below, we will affirm the decision of the Commissioner denying this claim.

## II.  <u>Statement of Facts and of the Case</u>

On January 30, 2019, Flor Sanchez filed her second application for supplemental security income benefits alleging that that she had been disabled since 2008 as a result of degenerative disc disease, obesity, depression, and migraine headaches. (Tr. 16, 18). Sanchez was born in 1973, was in her mid-40s when she filed this second disability application, and was considered a younger individual under the Commissioner's regulations at the time of the alleged onset of her disability. (Tr. 25). Given Sanchez's prior, unsuccessful disability application, the pertinent time frame for consideration in this second application was the period from 2018 through 2020, and more particularly from the date of her application for benefits, January 30, 2019, through the date upon which the ALJ denied her claim, May 18, 2020.

### A.  <u>Sanchez's Clinical History</u>

With respect to Sanchez's clinical history during the pertinent time frame, the ALJ aptly described a fairly conservative and unremarkable course of treatment for Sanchez, explaining that in 2019 her treatment history revealed the following clinical encounters:

> On January 30, 2019, Justin Fisher, MD, and Keith Bumeder, PA-C, noted that the claimant presented for a repeat Botox treatment for management of her chronic migraine headaches. They noted that her previous injections resulted in a significant improvement in her

3

headaches with a reduction in number of days with a headache by at least seven per month (Exhibit C4F). The claimant continued with Botox treatment. On September 13, 2019, Dr. Fisher and Mr. Bumeder noted that she presented for her repeats injection treatment. She reported ongoing headaches and migraines, 2-3 per month, despite her Botox treatment over the last few years. They noted that while this indicates a significant improvement overall, she reported no additional improvement with Botox treatments in quite some time and that the effects wear off after about a month and a half. They recommended that she discontinue Botox and begin treatment with Emgality, if approved by insurance (Exhibits C18F and C26F).

On February 6, 2019, Kristi Yacklovich, CRNP, with Lebanon Pain Relief Center examined the claimant. She noted her history of cervcalgia with left-sided neck pain and shoulder pain. The claimant reported relief during her two recent physical therapy sessions. She found that the claimant presented with tenderness at the cervical spine and moderate pain with range of motion of the cervical spine but with otherwise normal examination findings, including normal balance, gait, and coordination. On April 10, 2019, Ms. Yacklovich noted that the claimant completed physical therapy but with no reported relief. The claimant admitted to "doubling up" on oxycodone at times. She noted that her dose was increased last month. She found that the claimant presented with tenderness at the cervical spine and mildly reduced range of motion of the cervical spine but with otherwise normal examination findings, including normal balance, gait, and coordination. She recommended further evaluation with an MRI of the cervical spine (Exhibit C10F).

On March 14, 2019, Anne Dall, MD, noted the claimant's reported worsening symptoms with complaints of increased pain. She reported increased eating because of anxiety with resulting weight gain, which then makes her feel worse both physically and emotionally. Dr. Dall found that the claimant presented with a tearful mood and dysphoric mood but with otherwise normal findings, including logical thought process, normal thought content, good insight and judgment, intact decision-making capacity, and intact attention and concentration. She

recommended that the claimant begin a slow cross taper to transition from escitalopram to venlafaxine (Exhibits C11F and C13F).

The claimant's June 5, 2019 MRI of the cervical spine showed minimal bulging from C3-4 through C6-7, most prominently at the C5-6 level, and appearing relatively stable with no evidence of significant central of neural foraminal stenosis or significant change since the prior study (Exhibits C19F, C20F, and C23F). On June 13, 2019, Dr. Dall examined the claimant. She noted that the claimant visited her brother, who is undergoing cancer treatment, in Puerto Rico. She noted that the claimant stayed there for a month. She noted that the claimant reported doing less stress eating. She found that the claimant presented with dysphoric affect and tearful mood but with normal concentration, logical thought process, good insight and judgment, intact recent and remote memory and recall, and intact decision-making capacity. She recommended that the claimant continue to taper to transition from escitalopram to venlafaxine (Exhibits C15F and C27F).

On June 27, 2019, Dr. Lorenzo examined the claimant. He noted that her MRI of the cervical spine showed minimal disc bulges from C3 through C7, worse at the C5-6 level. He found that she presented with tenderness at the cervical spine and moderate pain with range of motion and with otherwise normal findings. He noted that she has been stable with opioids. He recommended an epidural steroid injection, which he performed on July 5, 2019, at the C7-T1 level. On July 18, 2019, Dr. Lorenzo noted that the claimant reported no pain for one week following the injection treatment and that her pain remained greatly improved overall. He noted that she stopped MSER and was taking only Oxycodone. He recommended a repeat injection when needed (Exhibits C19F and C20F).

On September 10, 2019, Ms. Yacklovich-Menicheschi noted that the claimant was last seen on July 18, 2019, and that she was in Puerto Rico visiting her ill brother. The claimant reported that she "made her meds stretch" and took some of her brother's pain medication. She warned the claimant of the dangers of taking other people's pain medication and that it was illegal. She found that the claimant presented with mildly reduced range of motion of the cervical spine. She recommended that

5

the claimant schedule a repeat cervical spine epidural steroid injection. Dr. Lorenzo performed the repeat injection on September 20, 2019 (Exhibits C19F and C20F).

On October 9, 2019, Dr. Dall noted that the claimant attended her brother's funeral in Puerto Rico. She noted that the claimant was follow-up with primary care regarding her multiple medical complaints. She found that the claimant presented with a blunted affect and depressed mood but with normal concentration, logical thought process, good insight and judgment, intact recent and remote memory and recall, and intact decision-making capacity. She recommended that the claimant continue her current medications (Exhibit C27F).

The claimant's November 25, 2019 EMG/NCS of the bilateral lower extremities showed normal findings (Exhibit C21F).

On January 9, 2020, Dr. Dall noted that the claimant reported enjoying the holidays but with some sadness due to the recent loss of her brother. She also complained of ongoing weight gain with increased eating. She found that the claimant presented with a blunted affect and depressed mood but with normal concentration, logical thought process, good insight and judgment, intact recent and remote memory and recall, and intact decision-making capacity. She recommended that the claimant increase bupropion back to the 300mg dose, as it seemed helpful with regard to appetite, and reduce venlafaxine back down to 37.5mg daily. The following month, Dr. Dall noted the claimant's ongoing complaints of low energy and frustration regarding her weight, which was noted at 215 pounds. She found that the claimant presented with a blunted affect but with a calm mood and otherwise normal mental status examination findings (Exhibit C27F).

On March 13, 2020, Dr. Fisher and Mr. Bumeder noted that the claimant had been off Botox treatment since October 2019 and had started Emgality with three months of treatment. The claimant reported a slight decrease in frequency and severity in her headaches with reported ongoing daily symptoms. They recommended that she continue with Emgality, as she would hopefully receive increased efficacy with treatment. They also recommended that the claimant

continue with Fioricet for acute treatment, as she finds it helpful generally (Exhibit C26F).

In addition to medication management with Dr. Dall, the claimant also participates in outpatient therapy with Carmen Marti, M.Ed., with PA Counseling Services. Her treatment notes indicate that her sessions are focused on identifying the sources and symptoms of depression, gaining coping strategies, and engaging in self-care tasks and other activities that bring positivity to her (Exhibits C13F and C27F).

(Tr. 22-24). Thus, Sanchez's clinical history in 2019 was marked by conservative pain management treatment, test results which revealed only mild degenerative disc disease, and counseling to address her depression and obesity. (Id.) There was no evidence of hospitalization, surgery, or in-patient care for any of these presenting medical conditions. (Id.)

### B. **Sanchez's Activities of Daily Living**

In addition to these relatively benign clinical findings, Sanchez's treatment notes from 2019 documented some of Sanchez's activities of daily living, including several trips which the plaintiff had taken to Puerto Rico during this period of claimed disability. (Id.) Moreover, in April of 2019, Sanchez completed an adult function report. (Tr. 262-72). While Sanchez complained of disabling pain in this report, she also acknowledged that she was able to attend to her personal needs and grooming, cook meals, do light house work, shop, pay bills, travel, attend church,

and go to sporting events. (Id.) Sanchez also reportedly started a gym membership at the YMCA during this period. (Tr. 1198).

## C. **The Medical Opinion Evidence**

Given this mixed and equivocal picture that emerged from Sanchez's treatment history and self-reported activities of daily living, medical professionals who examined her case in 2019 concluded that her impairments were not totally disabling. At the outset, in June and November of 2019, two non-examining state agency experts, Dr. Waldicar Nugent and Dr. Glenda Cardillo, reviewed Sanchez's medical records and determined that she retained to physical capacity to perform light work. (Tr. 83-117). Likewise, in 2019 two psychological experts, Dr. John Gavazzi and Dr. Thomas Fink, concluded that Sanchez was capable of performing simple work tasks and could meet the mental demands of some employment. (Id.)

Notably, there were no contemporaneous, countervailing opinions assessing Sanchez's physical and emotional capabilities in 2019, the pertinent time period. Instead, Sanchez seemingly relied upon treating source opinions provided in 2015, more than three years earlier in the context of her initial, denied disability application, to support this second disability claim.

It was on this record that Sanchez's second disability application came to be heard by the ALJ.

8

## D.      **The ALJ's Hearing and Decision**

It is against the backdrop of this evidence that the ALJ conducted a hearing in

Sanchez's case on May 6, 2020. Sanchez and a vocational expert ("VE") testified at

this hearing. (Tr. 39-58). Following this hearing on May 18, 2020, the ALJ issued a

decision denying Breazeale's application for benefits. (Tr. 10-32). In that decision,

the ALJ first concluded that Sanchez had not engaged in substantial gainful activity

since January 30, 2019, her application date. (Tr. 18). At Step 2 of the sequential

analysis that governs Social Security cases, the ALJ found that Sanchez's

depression, obesity, migraine headaches and degenerative disc disease were severe

impairments (Id.)

The ALJ also considered other impairments experienced by Sanchez but

deemed them not to be severe stating that:

> The claimant has a history of hypothyroidism, which is effectively
> managed with levothyroxine and routine monitoring (Exhibits C6F,
> C11F, C22F, and C29F). She has a history of moderate obstructive
> sleep apnea, which has been managed with a CPAP. The claimant
> reported difficulty with her CPAP machine. Her updated sleep study
> with CPAP titration in July 2019 showed that she did well at 11cm of
> water pressure (Exhibits C7F, C17F, and C23F). She has a history of
> dry eye. On February 21, 2019, Dr. Chen noted that the claimant started
> using serum tears, which she reported burn at first but then feels better.
> Her visual acuity was 20/25+2 on the right and 20/20 on the left with a
> normal visual field, right and left (Exhibits C8F and C11F). On June 6,
> 2019, Dr. Chen noted her reported ongoing complaints of "gritty eyes"
> with tiredness and difficulty reading. Her vision exam remained stable.
> He advised that there was no evidence of anything "organic to explain

9

her symptoms" and recommended that she continue Restasis, if covered by insurance, and if not to use chilled artificial tears (Exhibits C14F, C15F, and C24F). Thus, medical evidence of record supports a finding that these conditions have not caused more than a minimal limitation in the ability to perform basic work activities for 12 consecutive months since the application date.

The claimant alleges a history of fibromyalgia. However, this is not established as a medically determinable impairment pursuant to SSR 12-2p since the application date in this case. The claimant's treatment records since the application date indicate that she reported a history of fibromyalgia with related complaints but with no abnormal physical examination findings to support such a diagnosis (Exhibits C6F, C10F, C11F, C15F, C19F, C20F, C25F, C28F). Generally, a person can establish an MDI of fibromyalgia by providing evidence from an acceptable medical source. A licensed physician (a medical or osteopathic doctor) is the only acceptable medical source who can provide such evidence in addition to evidence that must document that the physician reviewed the person's medical history and conducted a physical exam. According to the 1990 ACR Criteria for the Classification of Fibromyalgia, we may find that a person has an MDI of fibromyalgia if he or she has all three of the following: (1) a history of widespread pain that has persisted (or that persisted) for at least 3 months. The pain may fluctuate in intensity and may not always be present; (2) At least 11 positive tender points on physical examination (the positive tender points must be found bilaterally (on the left and right sides of the body) and both above and below the waist); (3) evidence that other disorders that could cause the symptoms or signs were excluded. Other physical and mental disorders may have symptoms or signs that are the same or similar to those resulting from fibromyalgia. Therefore, it is common in cases involving fibromyalgia to find evidence of examinations and testing that rule out other disorders that could account for the person's symptoms and signs. Laboratory testing may include imaging and other laboratory tests. According to the 2010 ACR Preliminary Diagnostic Criteria, we may find that a person has an MDI of fibromyalgia if he or she has all three of the following criteria: (1) a history of widespread pain; (2) repeated manifestations of six or more fibromyalgia symptoms, signs, or co-

occurring conditions, especially manifestations of fatigue, cognitive or memory problems ("fibro fog"), waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome; and (3) evidence that other disorders that could cause these repeated manifestations of symptoms, signs, or co-occurring conditions were excluded. In this case, the above criteria are not met. Moreover, the record indicates that other disorders have not been excluded, including sleep apnea while she was experiencing issues with her CPAP (Exhibits C7F and C17F).

(Tr. 18-19).

At Step 3, the ALJ determined that none of these impairments met or medically equaled the severity of one of the listed impairments. (Tr. 19-21). Between Steps 3 and 4 the ALJ concluded that Sanchez retained the following residual functional capacity ("RFC"):

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except she should avoid concentrated exposure to extreme cold, noise, vibration, and hazards. She is able to perform work that is limited to simple and routine tasks, involving only simple, work-related decisions, and with few, if any, work place changes and no production pace work.

(Tr. 21).

In reaching this RFC determination, the ALJ detailed Sanchez's treatment history in 2019 and also examined her activities of daily living. (Tr. 21-24). The ALJ also evaluated the medical opinion evidence in light of this clinical record and the plaintiff's self-reported activities of daily living.

On this score, the ALJ found that the medical opinions from 2015 had little

persuasive power, observing that:

> While also reviewed and considered as part of the record as a whole,
> the opinions of Dr. Dall rendered on October 29, 2015, and Stuart
> Hartman, DO, rendered on November 4, 2015, are not persuasive as to
> the period at issue, as they were rendered over three years prior to the
> application date and during a previously adjudicated period (Exhibits
> C1F and C2F).

(Tr. 24). Instead, the ALJ assigned greater persuasiveness to the contemporary

medical consensus as reflected in the opinions of the four state agency experts, all

of whom found that Sanchez retained the ability to perform some work. As the ALJ

noted in this regard:

> On May 21, 2019, John Gavazzi, Psy.D., the State agency
> psychological consultant, assessed the claimant's functional abilities:
> she has a mild limitation in her ability to understand, remember, or
> apply information, interact with others, and adapt or mange herself and
> a moderate limitation in her ability to concentrate, persist, or maintain
> pace. She has a moderate limitation in her ability to understand,
> remember, and carry out detailed instructions. She can make simple
> decisions and perform simple, routine, repetitive tasks in a stable
> environment (Exhibit C3A). On October 17, 2019, Thomas Fink, Ph.D.,
> another State agency consultant, assessed the claimant's functional
> abilities. He concurred with Dr. Gavazzi's May 2019 assessment
> (Exhibit C5A). These assessments are persuasive. As State agency
> consultants, they reviewed the claimant's available treatment records
> prior to rendering their opinions, which are also consistent with the
> claimant's subsequent mental status examination findings, showing
> overall stable and normal presentations (Exhibit C27F/52, 56, 60, 64,
> 70, 74). They also supported their opinions, noting the claimant's
> outpatient treatment with no inpatient treatment and her overall
> functional daily activities (Exhibits C3A and C5A).

On June 7, 2019, Wadicar Nugent, MD, a State agency medical consultant, assessed the claimant's functional abilities: she can lift and carry twenty pounds occasionally and ten pounds frequently. She can stand and/or walk for six hours in an eight-hour workday. She can sit for six hours in an eight-hour workday. She has no limitation in her ability to push or pull other indicated by communicative limitations. She should avoid concentrated exposure to extreme cold, noise, vibration, and hazards (Exhibit C3A). On November 4, 2019, Glenda Cardillo, MD, another State agency medical consultant, assessed the claimant's functional abilities. She concurred with Dr. Nugent's June 2019 assessment (Exhibit C5A). These assessments are persuasive. As State agency consultants, they reviewed the claimant's available treatment records prior to rendering their opinions. Their opinions are supported by the above outlined treatment records including MRI of the C spine showing minimal abnormal findings (Exhibit C23F/45). Their opinions are supported by the claimant's activities of daily living including the ability to go overseas for a month long vacation (Exhibit C27F/41).

(Tr. 24-25).

Having reached these conclusions regarding the medical clinical and opinion evidence, the ALJ found that Sanchez could perform jobs that existed in significant numbers in the national economy. (Tr. 25-26). Accordingly, the ALJ determined that Sanchez had not met the demanding showing necessary to sustain this claim for benefits and denied this claim. (Tr. 27).

This appeal followed. (Doc. 1). On appeal, Sanchez challenges the adequacy of the ALJ's decision on three grounds, arguing the ALJ erred: (1) in the evaluation of the medical opinion evidence; (2) in the assessment of Sanchez's severe

13

impairments; and (3) in failing to fully recognize the severity of her other impairments. This appeal is fully briefed by the parties and is, therefore, ripe for resolution.

As discussed in greater detail below, having considered the arguments of counsel and carefully reviewed the record, and mindful of the deferential standard of review which applies here, we conclude that the ALJ's decision is supported by substantial evidence, and thus we will affirm the decision of the Commissioner denying this claim.

## III.   Discussion

### A.   Substantial Evidence Review – the Role of this Court

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F.Supp.2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla.

Richardson v. Perales, 402 U.S. 389, 401 (1971). A single piece of evidence is not

substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a

conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir.

1993). But in an adequately developed factual record, substantial evidence may be

"something less than the weight of the evidence, and the possibility of drawing two

inconsistent conclusions from the evidence does not prevent [the ALJ's decision]

from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n,

383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is

supported by substantial evidence the court must scrutinize the record as a whole."

Leslie v. Barnhart, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has underscored for us the limited scope of our review in

this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout
> administrative law to describe how courts are to review agency
> factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——,
> 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-
> evidence standard, a court looks to an existing administrative record
> and asks whether it contains "sufficien[t] evidence" to support the
> agency's factual determinations. Consolidated Edison Co. v. NLRB,
> 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis
> deleted). And whatever the meaning of "substantial" in other contexts,
> the threshold for such evidentiary sufficiency is not high. Substantial
> evidence, this Court has said, is "more than a mere scintilla." Ibid.; see,
> e.g., Perales, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks
> omitted). It means—and means only—"such relevant evidence as a
> reasonable mind might accept as adequate to support a conclusion."

15

> Consolidated Edison, 305 U.S. at 229, 59 S.Ct. 206. See Dickinson v.
> Zurko, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999)
> (comparing the substantial-evidence standard to the deferential clearly-
> erroneous standard).

Biestek, 139 S. Ct. at 1154.

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that [she] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); Burton v. Schweiker, 512 F.Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts"); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); Ficca, 901 F.Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014) (citing Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather

our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In Burnett, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ particular "magic" words: "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

This principle applies with particular force to legal challenges, like the claim made here, based upon alleged inadequacies in the articulation of a claimant's mental RFC. In Hess v. Comm'r Soc. Sec., 931 F.3d 198, 212 (3d Cir. 2019), the

17

United States Court of Appeals recently addressed the standards of articulation that apply in this setting. In Hess, the court of appeals considered the question of whether an RFC, which limited a claimant to simple tasks, adequately addressed moderate limitations on concentration, persistence, and pace. In addressing the plaintiff's argument that the language used by the ALJ to describe the claimant's mental limitations was legally insufficient, the court of appeals rejected a *per se* rule which would require the ALJ to adhere to a particular format in conducting this analysis. Instead, framing this issue as a question of adequate articulation of the ALJ's rationale, the court held that, "as long as the ALJ offers a 'valid explanation,' a 'simple tasks' limitation is permitted after a finding that a claimant has 'moderate' difficulties in 'concentration, persistence, or pace.'" Hess v. Comm'r Soc. Sec., 931 F.3d 198, 211 (3d Cir. 2019). On this score, the appellate court indicated that an ALJ offers a valid explanation a mental RFC when the ALJ highlights factors such as "mental status examinations and reports that revealed that [the claimant] could function effectively; opinion evidence showing that [the claimant] could do simple work; and [the claimant]'s activities of daily living, . . . . " Hess v. Comm'r Soc. Sec., 931 F.3d 198, 214 (3d Cir. 2019).

In our view, the teachings of the Hess decision are straightforward. In formulating a mental RFC, the ALJ does not need to rely upon any particular form

of words. Further, the adequacy of the mental RFC is not gauged in the abstract. Instead, the evaluation of a claimant's ability to undertake the mental demands of the workplace will be viewed in the factual context of the case, and a mental RFC is sufficient if it is supported by a valid explanation grounded in the evidence.

### B.    <u>Initial Burdens of Proof, Persuasion, and Articulation for the ALJ</u>

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §423(d)(1)(A); 42 U.S.C. §1382c(a)(3)(A); <u>see also</u> 20 C.F.R. §§404.1505(a), 416.905(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. §423(d)(2)(A); 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §§404.1505(a), 416.905(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §§404.1520(a), 416.920(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC). RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett, 220 F.3d at 121 (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §§404.1545(a)(2), 416.945(a)(2).

Once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be

set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), report and recommendation adopted, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018); Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017)..

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. §§404.1512(f), 416.912(f); Mason, 994 F.2d at 1064.

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical

opinion support for an RFC determination and state that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." Biller v. Acting Comm'r of Soc. Sec., 962 F.Supp.2d 761, 778–79 (W.D. Pa. 2013) (quoting Gormont v. Astrue, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that "[t]here is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings v. Colvin, 129 F.Supp.3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting, like that presented here, where well-supported medical sources have opined regarding limitations which would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other evidence. Biller, 962 F.Supp.2d at 778–79. In

this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when no medical opinion supports a disability finding or when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. See Titterington, 174 F. App'x 6; Cummings, 129 F.Supp.3d at 214–15. In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns, 312 F.3d 113; see also Rathbun, 2018 WL 1514383, at *6; Metzger, 2017 WL 1483328, at *5.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d

Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-707. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck v. Comm'r of Soc. Sec., 181 F. 3d 429, 433 (3d Cir. 1999).

### C.   Legal benchmarks for Step 2 Analysis.

At step-two of the sequential analysis which applies in Social Security appeals, the ALJ determines whether a claimant has a medically severe impairment or combination of impairments. Bowen v. Yuckert, 482 U.S. 137, 140-41, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987). An impairment is considered severe if it "significantly limits an individual's physical or mental abilities to do basic work activities. 20 C.F.R. 404.1520(c). An impairment is severe if it is "something beyond a 'slight abnormality which would have no more than a minimal effect on the Plaintiff's ability to do basic work activities. McCrea v. Comm'r of Soc. Sec., 370 F.3d at 357, 360 (3d Cir. 2004) (quoting SSR 85-28, 1985 WL 56856 (1985)). The Court of Appeals is clear that the step-two inquiry is a *de minimis* screening device used to cast out meritless claims. McCrea, 370 F.3d at 360; Newell v. Comm'r of Soc. Sec., 347 F.3d 541, 546 (3d Cir. 2003). The burden is on the claimant to show that an

24

impairment qualifies as severe. <u>Bowen</u>, 482 U.S. at 146, 107 S.Ct. 2287. <u>Stancavage</u> <u>v. Saul</u>, 469 F. Supp. 3d 311, 331 (M.D. Pa. 2020). However, an alleged Step 2 analysis error, standing alone, does not compel a remand since it is also well-settled that: "[E]ven if an ALJ erroneously determines at step two that one impairment is not 'severe,' the ALJ's ultimate decision may still be based on substantial evidence if the ALJ considered the effects of that impairment at steps three through five." <u>Naomi Rodriguez v. Berryhill</u>, No. 1:18-CV-684, 2019 WL 2296582, at *10 (M.D. Pa. May 30, 2019)(citing cases).

### D.    **<u>Standard of Review: Analysis of Medical Opinion Evidence.</u>**

Sanchez filed this disability application in January of 2019, following a paradigm shift in the manner in which medical opinions were evaluated when assessing Social Security claims. Prior to March 2017, ALJs were required to follow regulations which defined medical opinions narrowly and created a hierarchy of medical source opinions with treating sources at the apex of this hierarchy. However, in March of 2017, the Commissioner's regulations governing medical opinions changed in a number of fundamental ways. The range of opinions that ALJs were enjoined to consider were broadened substantially, and the approach to evaluating opinions was changed from a hierarchical form of review to a more holistic analysis. As one court as aptly observed:

The regulations regarding the evaluation of medical evidence have been amended for claims filed after March 27, 2017, and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded. According to the new regulations, the Commissioner "will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion." Revisions to Rules Regarding the Evaluation of Medical Evidence ("Revisions to Rules"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017), see 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on the following five factors: supportability; consistency; relationship with the claimant; specialization; and "other factors." 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).

Although the new regulations eliminate the perceived hierarchy of medical sources, deference to specific medical opinions, and assigning "weight" to a medical opinion, the ALJ must still "articulate how [he or she] considered the medical opinions" and "how persuasive [he or she] find[s] all of the medical opinions." Id. at §§ 404.1520c(a) and (b)(1), 416.920c(a) and (b)(1). The two "most important factors for determining the persuasiveness of medical opinions are consistency and supportability," which are the "same factors" that formed the foundation of the treating source rule. Revisions to Rules, 82 Fed. Reg. 5844-01 at 5853.

An ALJ is specifically required to "explain how [he or she] considered the supportability and consistency factors" for a medical opinion. 20 C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2). With respect to "supportability," the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(1), 416.920c(c)(1). The regulations provide that with respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more

26

persuasive the medical opinion(s) or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(2), 416.920c(c)(2).

Under the new regulations an ALJ must consider, but need not explicitly discuss, the three remaining factors in determining the persuasiveness of a medical source's opinion. Id. at §§ 404.1520c(b)(2), 416.920c(b)(2). However, where the ALJ has found two or more medical opinions to be equally well supported and consistent with the record, but not exactly the same, the ALJ must articulate how he or she considered those factors contained in paragraphs (c)(3) through (c)(5). Id. at §§ 404.1520c(b)(3), 416.920c(b)(3).

Andrew G. v. Comm'r of Soc. Sec., No. 3:19-CV-0942 (ML), 2020 WL 5848776, at *5 (N.D.N.Y. Oct. 1, 2020).

Oftentimes, as in this case, an ALJ must evaluate various medical opinions. While the framework for analysis of medical opinions has changed judicial review of this aspect of ALJ decision-making is still guided by several settled legal tenets. First, when presented with a disputed factual record, it is well-established that "[t]he ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011). Thus, when evaluating medical opinions "the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (quoting Mason, 994 F.2d at 1066). Therefore, provided that the decision is accompanied by an

adequate, articulated rationale, it is the province and the duty of the ALJ to choose which medical opinions and evidence deserve greater weight.

Further, in making this assessment of medical evidence:

> An ALJ is [also] entitled generally to credit parts of an opinion without crediting the entire opinion. See Thackara v. Colvin, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015); Turner v. Colvin, 964 F. Supp. 2d 21, 29 (D.D.C. 2013) (agreeing that "SSR 96–2p does not prohibit the ALJ from crediting some parts of a treating source's opinion and rejecting other portions"); Connors v. Astrue, No. 10–CV–197–PB, 2011 WL 2359055, at *9 (D.N.H. June 10, 2011). It follows that an ALJ can give partial credit to all medical opinions and can formulate an RFC based on different parts from the different medical opinions. See e.g., Thackara v. Colvin, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015).

Durden v. Colvin, 191 F.Supp.3d 429, 455 (M.D. Pa. 2016). In addition, where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings, 129 F.Supp.3d at 214–15.

Moreover, when evaluating a medical opinion from any medical source several other principles apply. For example, the ALJ may  discount such an opinion when it conflicts with other objective tests or examination results. Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 202–03 (3d Cir. 2008). Likewise, an ALJ may conclude that discrepancies between the source's medical opinion, and the source's actual treatment notes, justifies giving a medical opinion less persuasive power in a

disability analysis. Torres v. Barnhart, 139 F. App'x 411, 415 (3d Cir. 2005). Finally, "an opinion from a treating source about what a claimant can still do which would seem to be well-supported by the objective findings would not be entitled to controlling weight if there was other substantial evidence that the claimant engaged in activities that were inconsistent with the opinion." Tilton v. Colvin, 184 F. Supp. 3d 135, 145 (M.D. Pa. 2016).

### E.   The Decision of the ALJ Will Be Affirmed.

In this setting, we are mindful that we are not free to substitute our independent assessment of the evidence for the ALJ's determinations. Rather, we must simply ascertain whether the ALJ's decision is supported by substantial evidence, a quantum of proof which is less than a preponderance of the evidence but more than a mere scintilla, Richardson v. Perales, 402 U.S. 389, 401 (1971), and "does not mean a large or considerable amount of evidence," Pierce v. Underwood, 487 U.S. 552, 565 (1988), but rather "means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019). Judged against these deferential

standards of review, we are constrained to find that substantial evidence supported the ALJ's decision that Sanchez was not entirely disabled.

At the outset, we find that the ALJ did not err in following the consensus of the contemporaneous medical opinion evidence, all of which agreed that Sanchez had the ability to perform some work. In this case, the ALJ complied with the new regulatory scheme when evaluating these medical opinions, and substantial evidence supported this evaluation of the medical opinion evidence. First, the ALJ found that the state agency expert opinions were persuasive because those opinions were more congruent with Sanchez's longitudinal treatment history in 2019, which was marked by conservative pain management treatment, test results which revealed only mild degenerative disc disease, and counseling to address her depression and obesity. Moreover, as the ALJ aptly noted, there was no evidence of hospitalization, surgery, or in-patient care for any of these presenting medical conditions. Similarly, Sanchez's activities of daily living—which included attending to her personal needs and grooming, cooking meals, doing light house work, shopping, paying bills, travelling, attending church, and sporting events, as well as starting a gym membership at the YMCA during this period—were entirely consistent with the medical opinions. All of this evidence supported the ALJ's determination that Sanchez could perform simple light tasks and was therefore not totally disabled.

These findings by the ALJ were supported by substantial evidence; that is, " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " Biestek, 139 S. Ct. at 1154.  Further, given that "supportability . . . and consistency . . .  are the most important factors [to] consider when [] determine[ing] how persuasive [to] find a medical source's medical opinions . . . to be," 20 C.F.R. § 404.1520c(b)(2), we find that the ALJ was justified in concluding that the medical consensus reflected in these opinions, which found that Sanchez could perform some light work, were persuasive since they consistent with the overall clinical record and Sanchez's self-reported activities of daily living.

While Sanchez invites us to find that the ALJ erred in not giving greater weight to various treating source opinions which were issued in 2015 in connection with Sanchez's initial disability application, we will decline this invitation since the weight and persuasive power of these opinions were previously addressed in the prior ALJ decision denying Sanchez's first disability application. Moreover, even if we considered these prior medical opinions, we note that the opinions described Sanchez's condition in 2015 some three years prior to the alleged onset of her current disability. Thus, the ALJ's decision to eschew these temporally remote medical opinions in favor of the contemporary medical consensus of four state agency

experts all of whom found that Sanchez could perform some light work was entirely reasonable. There was no error here.

Finally, Sanchez contends that the ALJ erred in the assessment of the severity of her other medical impairments, which included sleep apnea, fibromyalgia, and eye strain and irritation. However, as we have noted, the ALJ's decision carefully explained why Sanchez's sleep apnea and eye irritation were not severe impairments, since they were managed through conservative treatment and appeared to only impose minimal limitations on her ability to perform work. (Tr. 18-19). Likewise, the ALJ explained that Sanchez's fibromyalgia was not medically determinable on the current record. The ALJ's rationale for making these determinations was fully set forth in this decision and substantial evidence supports these findings regarding the severity of Sanchez's ailments.

But in any event, it is evident that the ALJ considered these impairments throughout the sequential evaluation process and incorporated them into the limited light work RFC the ALJ crafted for Sanchez, an RFC which placed significant exertional restrictions upon Sanchez. This continued consideration of the plaintiff's physical impairments throughout the ALJ's decision is fatal to this Step 2 argument since it is well-settled that: "[E]ven if an ALJ erroneously determines at step two that one impairment is not 'severe,' the ALJ's ultimate decision may still be based

on substantial evidence if the ALJ considered the effects of that impairment at steps three through five." <u>Naomi Rodriguez v. Berryhill</u>, No. 1:18-CV-684, 2019 WL 2296582, at *10 (M.D. Pa. May 30, 2019) (citing cases). In this case it is evident that the ALJ considered all of Sanchez's physical impairments at Step 2 of the sequential evaluation process, and continued to consider them throughout this process in crafting the RFC for the plaintiff. Therefore, we find no basis for disturbing the ALJ's determination as to this issue.

In closing, the ALJ's assessment of the evidence in this case complied with the dictates of the law and was supported by substantial evidence, a term of art which means less than a preponderance of the evidence but more than a mere scintilla, <u>Richardson</u>, 402 U.S. at 401, and "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Pierce</u>, 487 U.S. at 565.. This is all that the law requires, and all that a claimant can demand in a disability proceeding. Thus, notwithstanding the plaintiff's skillful argument that this evidence might have been viewed in a way which would have also supported a different finding, we are obliged to affirm this ruling once we find that it is "supported by substantial evidence, 'even [where] this court acting *de novo* might have reached a different conclusion.' " <u>Monsour Med. Ctr. v. Heckler</u>, 806 F.2d 1185, 1190–91 (3d Cir. 1986) (quoting

<u>Hunter Douglas, Inc. v. NLRB</u>, 804 F.2d 808, 812 (3d Cir. 1986)). Accordingly, under the deferential standard of review that applies to appeals of Social Security disability determinations, we find that substantial evidence supported the ALJ's evaluation of this case.

## IV.   <u>**Conclusion**</u>

Accordingly, for the foregoing reasons, IT IS ORDERED that the final decision of the Commissioner denying these claims is AFFIRMED.

An appropriate order follows.

/s/ _Martin C. Carlson_
Martin C. Carlson
United States Magistrate Judge

DATED: March 29, 2022